WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Karen Williams,<br><br>               Plaintiff,<br><br>v.<br><br>Alhambra School District No. 68, et al.,<br><br>               Defendants. | No. CV-16-00461-PHX-GMS<br><br>**ORDER** |

Pending before the Court is the motion to dismiss of Defendants Alhambra School District No. 68, Robert Zamora, Ray Martinez and Mari Alvarado.[1] (Doc. 18.) For the following reasons, Defendants' motion is granted in part and denied in part.

## BACKGROUND

Plaintiff Karen Williams began employment with Defendant Alhambra School District ("Alhambra" or "the District") as Alhambra's Superintendent on or around July 1, 2010.[2] (Doc. 16 at 4.) Defendants Robert Zamora and Mari Alvarado were members of the Alhambra School Board (the "Board") at the time of Williams's hiring. (*Id.*) Defendant Ray Martinez was elected to the Board in late 2014 and began serving his term on January 1, 2015. (*Id.* at 14.) The dispute between Plaintiff and Defendants arises out

---

[1] Defendants have requested oral argument. That request is denied because the parties have had an adequate opportunity to discuss the law and evidence, and oral argument will not aid the Court's decision. *See Lake at Las Vegas Inv'rs Grp., Inc. v. Pac. Malibu Dev. Corp.*, 933 F.2d 724, 729 (9th Cir. 1991).

[2] The Court takes as true the allegations in Plaintiff's Amended Complaint at this stage of the litigation. *See Smith v. Jackson*, 84 F.3d 1213, 1217 (9th Cir. 1996).

of the circumstances in which Plaintiff's employment as Superintendent ended.

Williams, an African-American woman, alleges that her employment ended as the result of a "discriminatory plan of removing Williams in favor of a Latino/Hispanic candidate" for Superintendent. (*Id.* at 22.) She alleges that early in her tenure as Superintendent, Defendant Zamora told Williams that he believed District staff—including the Superintendent position—should be filled by candidates who "reflect[ed] the predominately Latino community demographic." (*Id.* at 4.) Williams told Zamora that she would recommend "the best and most qualified candidates for the positions regardless of race, color, or national origin." (*Id.*) Williams alleges that another Board member told Williams, on July 23, 2013, that Defendants Zamora and Alvarado "intended to conspire together to ensure that Alhambra engaged in discriminatory practices with respect to furthering the agenda to replace Williams and her peers with Latino employees." (*Id.* at 6.) Other Alhambra employees soon told Williams the same thing.[3] (*Id.* at 7.) An investigation conducted by Williams and Alhambra's human resources director provided further information along these lines. (*Id.*) Williams then made a complaint to Alhambra's attorney. (*Id.* at 7–8.) After receiving lower performance evaluation scores than usual, allegedly as a result of her refusal to engage in preferential hiring toward Hispanic individuals, Williams filed another complaint with the Board and asserted that state and federal law, as well as District policy, forbade her from hiring according to race or national origin. (*Id.* at 9.)

Williams had renegotiated her employment contract in April, 2012, after having served as Superintendent for nearly two years. (*Id.* at 5.) She was offered, and she accepted, a new contract in May of that year. (*Id.*) That contract provided for her continued employment as Superintendent from July 1, 2012, until June 30, 2015. (*Id.*)

In January, 2015, discussions between the Board and Williams regarding an extension or renewal of Williams's contract commenced. (*Id.* at 15.) The Board and

---

[3] Allegedly, Zamora and Alvarado (and later Martinez) also sought to remove Williams because she refused to recognize or endorse an organization called the Alhambra District Education Association ("ADEA") as the official union of the District. (Doc. 16 at 6.)

Williams met in executive session on January 22; the Board agreed to offer Williams a one year extension to her contract, and Williams agreed to the Board's proposal. (*Id.*) In the open meeting that followed, the Board voted unanimously to provide Williams with the contract renewal. (*Id.*)

After this meeting came negotiations over the contract. Although Williams alleges she accepted the extension of her contract as offered by the Board, she also alleges that she requested, through her attorney, two modifications to the proposed contract extension and one modification to the proposed Board resolution—modifications which she characterizes as "minor and immaterial" and upon which her acceptance was not conditioned (*Id.*) Alhambra's attorney agreed that two of the modifications were appropriate and immaterial and stated that though the District would have to approve the third, it had a "policy and practice" of doing so; for her part, Williams, through her attorney, stated that she would accept the contract regardless of whether the modifications were made. (*Id.* at 16–17.)

On February 19, 2015, the Board met. Two separate items on the agenda dealt with approving Williams's proposed modifications and her new contract. But no approval was forthcoming. One Board member (not a defendant here) moved to approve each item, but both motions failed for lack of a second. (*Id.* at 17.) On February 25, another meeting was held, with a new agenda item, regarding the selection of a firm to conduct the search for a new Superintendent. (*Id.* at 18.) A search firm was selected by a vote of three-to-one at a meeting on March 2. (*Id.* at 18–19.)

On March 26, the Board approved certain measures relating to the search for a new Superintendent. The Board then voted three-to-two to place Williams on non-disciplinary paid leave effective immediately, and voted three-to-one to appoint an interim Superintendent. On April 3, Williams received a letter from Alhambra's attorney notifying her that the Board had voted not to renew her contract. On June 4, the Board voted to offer a contract to Mark Yslas, who became the new Superintendent.

/ / /

1    Throughout the Board meetings in February and March, members of the public
2    voiced concerns that Williams was the victim of discrimination. (*Id.* at 18–20.) On
3    March 2 and again on March 26, Williams made "impassioned" public speeches at Board
4    meetings, complaining that she was being discriminated against and reiterating her desire
5    to remain as Superintendent. (*Id.*) At least one non-Defendant Board member also
6    publicly spoke out against what she saw as discriminatory and improper actions by
7    Defendants Zamora, Alvarado and Martinez. (*Id.* at 20.)

8    Williams brings this suit alleging various claims against the District itself and the
9    three members of the Board who voted to replace her and allegedly discriminated against
10   her. She alleges race, color and national origin discrimination, and retaliation under Title
11   VII; various violations of her constitutional and statutory rights; violation of her right to
12   contract under 42 U.S.C. § 1981; and three state law claims: breach of contract, breach of
13   the implied covenant of good faith and fair dealing, and wrongful termination.
14   Defendants seek dismissal for failure to state a claim.

## DISCUSSION

### I.     Legal Standard

17   To survive dismissal for failure to state a claim pursuant to Rule 12(b)(6), a
18   complaint must contain more than "labels and conclusions" or a "formulaic recitation of
19   the elements of a cause of action"; it must contain factual allegations sufficient to "raise
20   a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,
21   555 (2007). While "a complaint need not contain detailed factual allegations . . . it must
22   plead 'enough facts to state a claim to relief that is plausible on its face.'" *Clemens v.
23   DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008) (quoting *Twombly*, 550
24   U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content
25   that allows the court to draw the reasonable inference that the defendant is liable for the
26   misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550
27   U.S. at 556). The plausibility standard "asks for more than a sheer possibility that a
28   defendant has acted unlawfully. Where a complaint pleads facts that are 'merely

consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (internal citations omitted) (quoting *Twombly*, 550 U.S. at 557).

When analyzing a complaint for failure to state a claim under Rule 12(b)(6), "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Smith v. Jackson*, 84 F.3d 1213, 1217 (9th Cir. 1996). However, legal conclusions couched as factual allegations are not given a presumption of truthfulness, and "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss." *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998).

## II. Analysis

### A. Duplicative & Improper Parties

As an initial matter, Defendants challenge Williams's naming of the Board members as parties both in their official and individual capacities. They argue that Williams cannot name the Board members in their official capacity, since she has also named the District itself as a defendant, and that she cannot name them in their individual capacity since they have immunity as school board members.

A suit against a school board member in his or her official capacity is equivalent to a suit against the school district. *See Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cty. Sheriff Dep't*, 533 F.3d 780, 799 (9th Cir. 2008). But that only leads to dismissal of the member if they were not also sued in their individual capacity. *See id.* Here, the Board members are also sued in their individual capacity with respect to Williams's claims under § 1983 and § 1981. The individual Defendants are not, therefore, dismissed on such claims.

Defendants assert that they are entitled to absolute immunity from suit in their individual capacity because of their status as school board members. However, school board members are entitled only to assert a qualified good-faith immunity for liability under § 1983. *See Wood v. Strickland*, 420 U.S. 308, 318 (1975). Neither authority that

Defendants cite to the contrary is persuasive. A.R.S. § 12-820.01 does provide for absolute liability in certain decisions relating to hiring, but it applies to "public entit[ies]," not public officials.[4]  *See Wilson v. Maricopa Cty.*, 463 F. Supp. 2d 987, 999 (D. Ariz. 2006). Moreover, the Board member Defendants are sued in their individual capacity only under § 1983 and § 1981; a state law cannot immunize them against a federal cause of action.[5] *See Martinez v. State of Cal.*, 444 U.S. 277, 284 n.8 (1980); *ABC Sand & Rock Co., Inc. v. Maricopa Cty.*, No. CV-13-00058-PHX-NVW, 2013 WL 1693690, at *5 (D. Ariz. Apr. 18, 2013). *Community House, Inc. v. City of Boise, Idaho*, 623 F.3d 945 (9th Cir. 2010), is also inapplicable. *Community House* emphasizes that "[l]ocal government officials are entitled to [absolute] legislative immunity for their legislative actions." 623 F.3d at 959. Employment decisions with respect to an individual are not legislative actions and are not covered by legislative immunity. *See Bogan v. Scott-Harris*, 523 U.S. 44, 55–56 (1998); *Bechard v. Rappold*, 287 F.3d 827, 829 (9th Cir. 2002).

The Board member Defendants are therefore entitled only to qualified immunity. This protects them from suit "insofar as their conduct does not violate clearly established

---

[4] Defendants do assert, with respect to Williams's wrongful termination claim, that the District, as a "public entity," is immune under A.R.S. § 12-820.01. That statute, in relevant part, provides absolute immunity to "public entities" for acts and omissions of employees constituting a "legislative function" or an "administrative function involving the determination of fundamental government policy." Administrative functions, in turn, include the "determination whether to seek or whether to provide the resources necessary for . . . hiring of personnel." A.R.S. § 12-820.01(B). As discussed in the above paragraph, this cannot immunize the District against the federal law claims of Counts I through V, and the hiring of an employee is not a legislative function. And Arizona courts have made clear that the administrative functions covered by the statute are those at the policymaking level, rather than the individual implementation level. *See A Tumbling-T Ranches v. Flood Control Dist. Of Maricopa Cty.*, 222 Ariz. 515, 538, 217 P.3d 1220, 1243 (Ct. App. 2009) (collecting cases). Thus, the statute's provision of absolute immunity for decisions regarding the allocation and spending of resources on hiring applies to the decision to create a superintendent position, but not to decisions relating to the employment of a superintendent.

[5] This is one of three reasons why A.R.S. § 15-1443(C), also cited by Defendants, does not provide them with absolute immunity. A second reason is that the statute applies to *community college* district boards, not elementary school district boards. Even setting aside these first two bars to its application, the statute only confers immunity for actions taken "in good faith" and "within the scope of [the members'] authority"—which sounds in qualified, rather than absolute, immunity. Likewise, the statute that does confer immunity on school district board members, A.R.S. § 15-341(E), does not apply in cases of "intentional misconduct."

statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). As the Ninth Circuit has held, the intentional racial discrimination that Williams alleges is both inconsistent with acting in good faith, and a violation of clearly established constitutional rights:

> No official can in good faith impose discriminatory burdens on a person or group by reason of a racial or ethnic animus against them. The constitutional right to be free from such invidious discrimination is so well established and so essential to the preservation of our constitutional order that all public officials must be charged with knowledge of it. . . . [O]nce a defendant is shown to have acted with intent to discriminate based on racial or ethnic hostility, such intent constitutes the malicious intention to cause a deprivation of constitutional rights that is inconsistent with the subjective state of mind required for the defense of good faith immunity.

*Flores v. Pierce*, 617 F.2d 1386, 1392 (9th Cir. 1980). Thus, qualified immunity does not apply here, and the Board member Defendants are subject to suit in their individual capacities.

### B.     Title VII Claims

At the motion to dismiss stage, a plaintiff need not present a prima facie case of employment discrimination under Title VII, but must merely allege facts plausibly suggesting an entitlement to relief. *See Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 515 (2002).[6] Nevertheless, it is still helpful to consider the elements of a prima facie claim in determining whether the alleged facts do indeed plausibly suggest an entitlement to relief. To make out a prima facie claim for discrimination under Title VII, a plaintiff must either provide direct evidence suggesting that an employment decision was made based on an impermissible criterion, or meet the four-part *McDonnell Douglas* test for circumstantial evidence. *See EEOC v. Boeing Co.*, 577 F.3d 1044, 1049 (9th Cir. 2009). That four-part test requires the plaintiff to allege that she: (1) belongs to a protected class; (2) was qualified for the position; (3) was subject to an adverse employment action; and (4) similarly situated individuals outside her protected class were treated more favorably.

---

[6] *Swierkiewicz* remains good law even after the clarification of pleading standards in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). *See, e.g.*, *Sheppard v. David Evans & Assocs.*, 694 F.3d 1045, 1050 n.2 (9th Cir. 2012).

*Moran v. Selig*, 447 F.3d 748, 753 (9th Cir. 2006).

### 1. Count I: Race Discrimination

As an African-American, Williams belongs to a protected class. *See Lyons v. England*, 307 F.3d 1092, 1113 (9th Cir. 2002). She has alleged facts that she was qualified for the position at issue—not only did she serve as Superintendent for five years, but she also received "exemplary" performance reviews. (Doc. 16 at 5.) And, ultimately, someone outside her protected class—Mark Yslas, a Hispanic man—was chosen to replace her as Superintendent. (*Id.* at 21.) She has also, of course, alleged direct evidence of racial discrimination in the form of comments made by Defendants.

There remains the question of whether Williams was subject to an adverse employment action, without which she cannot plausibly allege that she is entitled to relief either under a direct or circumstantial theory.

Under Arizona law, school administrators are not entitled to a renewal of their contracts. *See Paczosa v. Cartwright Elementary Sch. Dist. No. 83*, 222 Ariz. 73, 79, 213 P.3d 222, 228 (Ct. App. 2009). But there is still a question of whether non-renewal of a contract, even unrelated to any entitlement, could constitute an adverse action. Neither party addresses this issue (except insofar as Williams asserts she was "terminated") and the Court is unaware of any Ninth Circuit case on point. But there is ample persuasive authority suggesting that non-renewal can be adverse employment action.

The Eleventh Circuit, for example, recently held that a non-renewal of a superintendent's contract by a school board may constitute adverse employment action in the Title VII discrimination context. *See Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1242 (11th Cir. 2016). More generally, numerous other circuits have held that non-renewal of employment contracts may be adverse action. *See, e.g.*, *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 501 (2d Cir. 2009), *superseded by statute on other grounds*; *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 320 (3d Cir. 2008); *Mateu-Anderegg v. Sch. Dist. Of Whitefish Bay*, 304 F.3d 618, 625 (7th Cir. 2002). To hold otherwise, as the Second Circuit noted, would be to "effectively rule that *current* employees seeking a

renewal of an employment contract are not entitled to the same statutory protections under the discrimination laws as *prospective* employees." *Leibowitz*, 584 F.3d at 500. Count I therefore adequately states a plausible claim for relief.

### 2. Count II: National Origin/Color Discrimination

Title VII also prohibits employment discrimination on the basis of color and national origin. 42 U.S.C. § 2000e-2. Williams includes both in her Count II, but the two are distinct.

Little authority exists defining the contours of a plausible color discrimination claim, and that which does exist is not binding on this Court. Courts that have discussed the issue have emphasized that an allegation of racial discrimination does not necessarily equate to an allegation of color discrimination. Rather, "[c]olor discrimination arises when the particular hue of the plaintiff's skin is the cause of the discrimination, such as in the case where a dark-colored African-American individual is discriminated against in favor of a light-colored African-American individual." *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 n.5 (4th Cir. 2002). This comports with the EEOC's definition of color discrimination as "when a person is discriminated against based on the lightness, darkness, or other color characteristic of the person." EEOC Compliance Manual § 15-III, What is "Color" Discrimination, 2006 WL 4673426, at *1 (June 1, 2006). There are no facts alleged that any of the Defendants discriminated against Williams on the basis of the particular hue of her skin.

Williams has, however, alleged a plausible claim for national origin discrimination. She alleges that Zamora and Martinez made public comments that Williams's national origin did not reflect that of the community. (Doc. 16 at 22.) She alleges specifically that at a community luncheon, Martinez stated that Alhambra should focus its efforts to cater to "Mexicanos," and therefore staff Alhambra with "Latino/Hispanic" employees. (*Id.*) Whether Martinez meant to use "Mexicanos" as a term of nationality or of ethnicity is ambiguous from context, from general usage, and indeed from the concept of ethnicity itself. As other courts have recognized, the line between national origin and ethnicity may

be a blurry one. *See Salas v. Wisc. Dep't of Corr.*, 493 F.3d 913, 923 (7th Cir. 2007). Either way, there is a plausible claim for national origin discrimination. The EEOC's Enforcement Guidance on National Origin Discrimination, for example, cites the exact scenario Williams alleges as an example of national origin discrimination. *See* EEOC Enforcement Guidance on National Origin Discrimination, 2016 WL 7116703, at *3 (Nov. 18, 2016) ("National origin discrimination also includes discrimination against a person because she does *not* belong to a particular ethnic group, such as less favorable treatment of employees who are *not* Hispanic."); *see also Chaiffetz v. Robertson Research Holding, Ltd.*, 798 F.2d 731, 732–33 (5th Cir. 1986); *Jimenez v. Servicios Agricolas Mex, Inc.*, 742 F. Supp. 2d 1078, 1086 (D. Ariz. 2010).

Williams has thus stated a plausible claim for national origin discrimination, but not color discrimination. Count II survives insofar as it alleges national origin discrimination.

### 3. Count III: Retaliation

The Civil Rights Act of 1964 also "prohibits retaliation against an employee 'because [she] has opposed any practice made an unlawful employment practice'" by Title VII. *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1082 (9th Cir. 1996) (quoting 42 U.S.C. § 2000e-3(a)). The elements of a Title VII retaliation claim are as follows: (1) the employee was engaged in a protected activity, (2) the employee was thereafter subjected by his employer to an adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action. *Thomas v. City of Beaverton*, 379 F.3d 802, 811 (9th Cir. 2004).

Here, there is at least a plausible allegation that Williams was retaliated against. Protected activity, for Title VII retaliation purposes, includes formal and informal complaints of activity that the employee reasonably believes violates Title VII. *See, e.g.*, *Ray v. Henderson*, 217 F.3d 1234, 1240 & n.3 (9th Cir. 2000). Williams alleges that on multiple occasions she publicly spoke out against a practice of racially discriminatory hiring, which is made unlawful by Title VII.

- 10 -

For the second, she has plausibly alleged being subjected to an adverse employment action. "Adverse employment actions" are defined more broadly in the context of retaliation than in the context of substantive discrimination. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). An adverse employment action need not be an "ultimate employment action" such as a termination, nor need it be "a materially adverse change in the terms and conditions of employment" such as a pay cut; rather, an adverse employment action need only be something that is "reasonably likely to deter employees from engaging in protected activity." *See Ray*, 217 F.3d at 1242–43. Even if Williams was not entitled to a renewal of her contract (or an offer of a new contract) a decision along those lines by the Board would be reasonably likely to deter her from engaging in protected activity. Moreover, Williams alleges that, on March 26, 2015, after the Board had voted to search for a new Superintendent, the Board voted to place Williams on "non-disciplinary paid leave effective immediately." (Doc. 16 at 19.) Placing an employee on paid leave can constitute adverse employment action in the retaliation context. *Dahlia v. Rodriguez*, 735 F.3d 1060, 1078 (9th Cir. 2013).

Finally, she has plausibly alleged a causal link between her protected activity and the adverse employment actions. At this early stage in the litigation, Williams need only show "that the protected activity and the negative employment action are not completely unrelated." *See Poland v. Chertoff*, 494 F.3d 1174, 1181 n.2 (9th Cir. 2007). Contrary to Defendants' assertions, Williams alleges that she engaged in protective activity long before the board meetings and contract negotiations of early 2015, including several complaints at the end of 2013. (Doc. 16 at 7–9.) Closer in time, Williams alleges that she gave an "impassioned speech" on her own behalf at a board meeting on March 2, and that the Board voted immediately afterwards to choose a firm to conduct the search for a new Superintendent. "That an employer's actions were caused by an employee's engagement in protected activities may be inferred from 'proximity in time between the protected action and the allegedly retaliatory employment decision.'" *Ray*, 217 F.3d at 1244 (quoting *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987)). Count III is

adequately pled.

### C.     Count IV: 42 U.S.C. § 1983

"To state a claim for relief in an action brought under § 1983, [plaintiffs] must [allege] that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999). "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). Here, Williams alleges violations of her First and Fourteenth Amendment rights.[7] (Doc. 16 at 26–27.)

Under this Count as well as Count V, Williams seeks relief against both the individual Board member Defendants and against Alhambra as an entity. There are thus two additional hurdles that Williams must clear, one with respect to the Board member Defendants, and one with respect to Alhambra.

To hold members of a school board liable under § 1983 or § 1981, the plaintiff must overcome the members' qualified immunity. As discussed above, Williams has "adequately allege[d] the commission of acts that violated clearly established law," as she must to defeat qualified immunity at this stage of litigation. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

To hold a government body such as a school board liable under § 1983 or § 1981, the plaintiff must demonstrate that the violation occurred as a result of a "deliberate policy, custom, or practice." *See Galen v. Cty. of L.A.*, 477 F.3d 652, 667 (9th Cir. 2007).

Williams has sufficiently so alleged. The three individual Defendants constituted a majority of the Board beginning in January, 2015, and continuing throughout the period of contract negotiations, up through the decision to hire a replacement Superintendent in

---

[7] To the extent that Williams asserts a claim for a violation of state open meeting laws with respect to her, those claims cannot be brought under § 1983 since such claims are not secured to her by the Constitution or laws of the United States. Such claims are, therefore, dismissed.

- 12 -

1   Williams's place.  Williams alleges that each of the three wished to replace her with a
2   Hispanic Superintendent; taking these allegations as true, it is plausible to infer that when
3   they voted to replace Williams, they were acting out of racially discriminatory motives.
4   This suffices to establish that a policy, custom or practice of the Board led to Plaintiff's
5   constitutional claims.  *Cf. Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227, 1239 (9th
6   Cir. 1994) (finding no official policy when only one member of a board expressed racial
7   animosity and a majority vote of the board was necessary to undertake a decision);
8   *Mason v. Village of El Portal*, 240 F.3d 1337, 1340 (11th Cir. 2001) ("[T]here can be no
9   municipal liability unless all three members of the council who voted against
10  reappointing Plaintiff shared the illegal motive.").

11  Substantively, Williams alleges violations of her First Amendment right to free
12  speech and her Fourteenth Amendment rights to equal protection and due process.

13  Williams has properly stated a claim for violation of her First Amendment rights.
14  To make out a claim of First Amendment retaliation against a public employer, a plaintiff
15  must show that "(1) [t]he employee engaged in constitutionally protected speech, (2) the
16  employer took adverse employment action against the employee, and (3) the employer's
17  speech was a 'substantial or motivating' factor in the adverse action." *Freitag v. Ayers*,
18  468 F.3d 528, 543 (9th Cir. 2006).  This is similar to the prima facie case for Title VII
19  retaliation, discussed above, but the speech at issue here must be *constitutionally*
20  protected.  The First Amendment protects a public employee from retaliation if she
21  "speaks as a citizen on a matter of public concern." *Huppert v. City of Pittsburg*, 574
22  F.3d 696, 702 (9th Cir. 2009), *overruled on other grounds by Dahlia v. Rodriguez*, 735
23  F.3d 1060, 1071 (9th Cir. 2013).  But when public employees speak "pursuant to their
24  official duties, the employees are not speaking as citizens for First Amendment purposes,
25  and the Constitution does not insulate their communications from employer discipline."
26  *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).

27  Whether an employee speaks pursuant to her official duties or as a private citizen
28  is a "'practical,' fact-specific inquiry." *Dahlia*, 735 F.3d at 1071.  Relevant factors

1    include whether the employee spoke only within her "chain of command" or to the public
2    at large; whether the subject matter of the speech falls within the employee's duties[8]; and
3    whether the employee spoke against the wishes of supervisors. *Id.* at 1074–76. The facts
4    that Williams has alleged sufficiently state a plausible claim that she spoke not pursuant
5    to her official duties but as a private citizen.

6    Williams has also sufficiently alleged a violation of her rights under the Equal
7    Protection Clause of the Fourteenth Amendment. A complaint that sufficiently states a
8    claim for race discrimination under Title VII also sufficiently states a claim under § 1983
9    through the Equal Protection Clause. *See, e.g.*, *FDIC v. Henderson*, 940 F.2d 465, 472
10   n.14 (9th Cir. 1991); *Lowe v. City of Monrovia*, 775 F.2d 998, 1010–11 (9th Cir. 1985).

11   Williams has also sufficiently alleged a claim under the Due Process Clause of the
12   Fourteenth Amendment. "To establish a due process violation, a plaintiff must show that
13   he has a protected property interest under the Due Process Clause and that he was
14   deprived of the property without receiving the process that he was constitutionally due."
15   *Levine v. City of Alameda*, 525 F.3d 903, 905 (9th Cir. 2008). As discussed more fully
16   below, Williams has alleged that she entered into a contract extension with the District
17   for a one-year term, and that that contract was then breached. A contract providing for a
18   set term of employment creates a "property interest which cannot be extinguished without
19   conforming to the dictates of procedural due process." *McClanahan v. Cochise Coll.*, 25
20   Ariz. App. 13, 18, 540 P.2d 744, 749 (1975). Procedural due process requires "some
21   kind of hearing" prior to termination. *See Carlson v. Ariz. State Personnel Bd.*, 214 Ariz.
22   426, 430, 153 P.3d 1055, 1059 (Ct. App. 2007) (quoting *Cleveland Bd. of Educ. v.*
23   *Loudermill*, 470 U.S. 532, 542 (1985)). At this stage, Williams has sufficiently alleged
24   that she did not receive the process she was due.
25   / / /

---

[8] To illustrate this, the Ninth Circuit contrasted an employee writing a "routine report . . . about a particular incident or occurrence" with an employee raising "broad concerns about corruption or systemic abuse." *Dahlia*, 735 F.3d at 1075. The former would be within the employee's duties; the latter would not be, unless the employee worked in a watchdog department specifically tasked with rooting out corruption or systemic abuse.

- 14 -

Therefore, Williams has sufficiently alleged claims under § 1983 for violations of her First Amendment right to free speech and her Fourteenth Amendment rights to equal protection and due process.

### D.     Count V: 42 U.S.C. § 1981

Section 1981 protects the equal right of all persons to, among other things, "make and enforce contracts."  42 U.S.C. § 1981.  This broadly includes protections against impermissible discrimination in the context of an employment relationship. *See Manatt v. Bank of Am.*, *NA*, 339 F.3d 792, 797 (9th Cir. 2003). As with § 1983, the "legal principles guiding a court in a Title VII dispute apply with equal force in a § 1981 action." *Id.* Defendants' only contention for dismissal of Plaintiff's § 1981 claim is that Plaintiff has failed to establish a specific policy, custom or practice that led to the violation of her rights. *See Fed'n of African Am. Contractors v. City of Oakland*, 96 F.3d 1204, 1215 (9th Cir. 1996) (finding that the "policy or custom" requirement is also necessary to a § 1981 claim). As discussed above, the Board members' alleged actions establish a specific policy, custom, or practice of the District.  Count V is adequately pled.

### E.     Count VI: Breach of Contract

To succeed in a breach of contract claim, a plaintiff must show that an enforceable contract exists, that it was breached, and that the plaintiff suffered damages. *Graham v. Asbury*, 112 Ariz. 184, 185, 540 P.2d 656, 657 (1975). An enforceable contract requires an offer, acceptance, consideration, and sufficiently specific terms. *Rogus v. Lords*, 166 Ariz. 600, 602, 804 P.2d 133, 135 (Ct. App. 1991).  The parties must intend to be bound. *Id.* Viewing the facts in the light most favorable to Williams, she has sufficiently alleged a breach of contract claim.

The Board allegedly "agreed to offer Williams a one year extension to her 2012 contract" on January 22, 2015, through a unanimous vote in an open Board meeting. (Doc. 16 at 15.)  Williams "accepted the Board's proposal," and during discussions of the contract's details communicated to Alhambra's attorney that she accepted the contract regardless of whether or not her requested modifications were made. (*Id.* at 15–16.)  A

- 15 -

1. plaintiff may not, of course, survive a motion to dismiss simply by using the words "offer" and "acceptance." *See Twombly*, 550 U.S. at 545 ("[A] formulaic recitation of a cause of action's elements will not do."). But Williams has alleged specific facts plausibly suggesting that the parties intended to be bound by the purported offer and the purported acceptance. Whether the parties intended to be bound is a question of fact. *Tabler v. Indus. Comm'n of Ariz.*, 202 Ariz. 518, 521, 47 P.3d 1156, 1159 (Ct. App. 2002). It would be inappropriate to dismiss Williams's plausible claim for breach of contract at this stage.[9]

Defendants also raise the Statute of Frauds as an affirmative defense to Williams's breach of contract claim. Under the Statute of Frauds, "an agreement which is not to be performed within one year from the making thereof" will not be enforced "unless the promise or agreement upon which the action is brought, or some memorandum thereof, is in writing and signed by the party to be charged, or by some person by him thereunto lawfully authorized." A.R.S. § 44-101. The contract extension that Williams and the Board were negotiating in early 2015 was to begin when Williams's current contract expired in June, 2015, and continued for a year thereafter. This brings it within the Statute of Frauds. *See Co-Op Dairy, Inc. v. Dean*, 102 Ariz. 573, 574–75, 435 P.2d 470, 471–72 (1967).

Affirmative defenses are most properly raised in a responsive pleading. *See Vernon v. Heckler*, 811 F.2d 1274, 1278 (9th Cir. 1987). It may be proper for a court to address the Statute of Frauds on a 12(b)(6) motion if the basis for dismissal is apparent from the face of the complaint. *See, e.g.*, *Miller v. BAC Home Loans Servicing, L.P.*, 726 F.3d 717, 726 (5th Cir. 2013); *Meadows v. First Am. Tr. Servicing Sols., LLC*, No. 11-CV-5754 YGR, 2012 WL 3945491, at *3 (N.D. Cal. Sept. 10, 2012). That is not the case here. Williams alleges the existence of a written memorandum, delivered to her by Alhambra's attorney, at the unanimous direction of the Board, containing the "contract of employment, Performance Based Pay Plan, and a Resolution." (Doc. 16 at 15.) In light

---

[9] There is no dispute that, on the facts alleged, any contract for an extension was supported by consideration, contained specific terms, was breached, and the breach thereof caused damage to Williams.

- 16 -

of the admonition that the Statute of Frauds "was intended as a shield, and not as a sword," *Diamond v. Jacquith*, 14 Ariz. 119, 123, 125 P. 712, 714 (1912), this is sufficient to survive dismissal on Statute of Frauds grounds at this stage.

### F. Count VIII: Breach of the Implied Covenant of Good Faith and Fair Dealing

"Arizona law implies a covenant of good faith and fair dealing in every contract." *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Tr. Fund*, 201 Ariz. 474, 490, 38 P.3d 12, 28 (2002). "The implied covenant of good faith and fair dealing prohibits a party from doing anything to prevent other parties to the contract from receiving the benefits and entitlements of the agreement." *Id.* While a breach of contract does not necessarily constitute a breach of the implied covenant of good faith and fair dealing, *see id.*, Williams alleges that the Defendants breached her employment contract out of bad faith, racially discriminatory motives, thus depriving her of the benefits to which she was entitled under the contract. This is sufficient to state a claim for relief on this Count.

### G. Count VII: Wrongful Termination

Count VII seeks relief under A.R.S. § 23-1501, governing the wrongful termination of employees; specifically, the provisions barring termination in retaliation for the employee's refusal to violate Arizona law or reporting of violations of Arizona law. *See* A.R.S. § 23-1501(3)(c)(i–ii). The statute does not explicitly define termination, but a breach of an employment contract is one action that may constitute wrongful termination. *See* A.R.S. § 23-1501(3)(a). That provision is not the provision that Williams cites, but as the statute lists other forms of wrongful termination *not* involving an actual breach of contract, it is reasonable to interpret termination broadly to include an ending of the employment relationship, and wrongful termination to be an ending of the employment relationship in improper, statutorily-defined circumstances. Subsection (3)(c) prohibits termination in retaliation for the employee's reasonable disclosure of "information or reasonable belief" that the employer is violating the Constitution or laws of Arizona. In this way, it is analogous to Williams's retaliation claims under Title VII

1 and § 1983 and is, likewise, sufficiently pled.

2 There is, however, a question of whether Williams is foreclosed from seeking judicial relief. The wrongful termination statute provides that if an employee is terminated in violation of a state statute, and that statute provides a remedy, then the employee is limited to the statutory remedy and may not sue under the wrongful termination statute. A.R.S. 23-1501(3)(b).

Five statutes are specifically listed in A.R.S. 23-1501(3)(b) as providing exclusive remedies. One of these, A.R.S. § 38-532, proscribes certain whistleblowing-related retaliation and provides for a mandatory administrative remedy.

But the wrongful termination statute also contains its own prohibition on whistleblowing-related retaliation, and it is this provision under which Williams brings suit. *See* A.R.S. 23-1501(3)(c). The two provisions are sufficiently different as to give full effect to each. Section 38-532 only applies when the employee has made a disclosure to a public body, in writing, including certain statutorily enumerated information about a violation that has taken place. Section 23-1501(3)(c), on the other hand, extends broadly to disclosures made "in a reasonable manner," of "information or a reasonable belief," made to an employer or the representative of an employer, of past, present, or possible future violations of Arizona constitutional or statutory law—and, indeed, to a simple refusal by the employee to comply with unconstitutional or illegal directions.

The two statutes are thus distinct, made all the more apparent because Williams's allegations clearly fall within the text of § 23-1501(3)(c) and are not clearly within the text of § 38-532. She is not relegated to the administrative remedy of § 38-532 and has thus sufficiently stated a claim under the wrongful termination statute.

### H. Punitive Damages

Williams requests "punitive damages pursuant to Title VII, 42 U.S.C. § 1983, and 42 U.S.C. § 1981," from Defendants. Alhambra, however, is immune from punitive damages for violations of Title VII, 42 U.S.C. § 1983, and 42 U.S.C. § 1981. *See* 42 U.S.C. § 1981a(b)(1) (barring recovery of punitive damages against a political

subdivision); *City of Newport v. Fact Concerts*, 453 U.S. 247, 271 (1981) (holding that municipalities are immune from punitive damages under § 1983); *S. Union Co. v. Sw. Gas Corp.*, 415 F.3d 1001, 1010 (9th Cir. 2005), *opinion amended on denial of reh'g*, 423 F.3d 1117 (9th Cir. 2005) (holding that *City of Newport* barred punitive damages in all civil rights cases including § 1981 claims). Williams may, however, seek punitive relief from the Board members as she has sufficiently pled that Defendants' conduct was "motivated by evil motive or intent, or . . . involve[d] reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Accordingly, Defendants' motion to dismiss Williams's claim for punitive damages from Alhambra is granted while Defendants' motion to dismiss Williams's claim for punitive damages from the Board members is denied.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is granted in part and denied in part. Plaintiff's claims (1) for color discrimination under Title VII; (2) for relief under 42 U.S.C. § 1983 based on a violation of state law; and (3) for punitive damages from Defendant Alhambra School District No. 68 are dismissed and the motion is denied in all other aspects.

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss (Doc. 18) is **GRANTED** in part and **DENIED** in part.

Dated this 10th day of February, 2017.

Honorable G. Murray Snow
United States District Judge