**GUST ROSENFELD P.L.C.**
One East Washington Street, Suite 1600
Phoenix, Arizona 85004-2553
Telephone: 602-257-7422
Facsimile: 602-340-1538
Robert D. Haws – 012743
rhaws@gustlaw.com
Shelby M. Exposito – 029546
smexposito@gustlaw.com
**Attorneys for Defendants**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Karen Williams, | No. CV 16-00461-PHX-GMS |
| Plaintiff, | |
| v. | **MOTION FOR SUMMARY JUDGMENT [REDACTED]** |
| Alhambra Elementary School District, et al., | (Oral Argument Requested) |
| Defendants. | |

Defendants Alhambra Elementary School District ("District"), Robert Zamora ("Zamora"), Ray Martinez ("Martinez"), and Mari Alvarado ("Alvarado") move for summary judgment pursuant to Rule 56, Fed. R. Civ. P. Plaintiff Karen Williams ("Williams") has failed to support her allegations, no disputes of material fact exist, and Defendants are entitled to judgment as a matter of law. This motion is supported by the simultaneously filed Statement of Facts in Support of Motion for Summary Judgment ("SOF") and the following memorandum of points and authorities.

### MEMORANDUM OF POINTS AND AUTHORITIES

### I. Facts

Alhambra hired Plaintiff as a Principal in 1996. SOF ¶ 1. She remained employed, with increasing levels of responsibility until 2010, when she was chosen as Alhambra's Superintendent. SOF ¶ 2. Her first Superintendent contract (written and

signed by both parties) covered July 1, 2010 through June 30, 2013 and provided a base salary of $151,000, with yearly increases and benefits totaling more than $21,000. SOF ¶ 2, Ex. 3.

In May 2012, Alhambra and Plaintiff entered into a new written three-year contract, signed by both parties. SOF ¶ 3. This contract gave Plaintiff a base salary of $185,000 for the 2012-13 year, with increases each subsequent year. SOF ¶ 3, Ex. 4. The contract also provided the following benefits each year: $7,500 business expense allowance, Plaintiff's choice of insurance plans, $16,500 tax-deferred annuity, $8,400 car allowance, and up to 15% of base salary as performance pay. Ex. 4 at AESD0282-84. The contract also gave Plaintiff 33 vacation and sick days annually and allowed her to receive payment for unused days at the end of each fiscal year. *Id.* Zamora and Alvarado voted in favor of both the 2010 and 2012 contracts for Plaintiff. SOF ¶ 4.

Plaintiff's base salary was increased to $191,475 for the 2013-14 year. SOF ¶ 5. In May 2014, her base salary was increased again to $198,176.83 for the 2014-15 year. SOF ¶ 6. The same month, the board (including Zamora and Alvarado) also approved an extra contract for $23,156.56. SOF ¶ 7. Adding to her compensation in 2014-15, Plaintiff also received payment for 71 unused sick and vacation days at the rate of $886.83 per day. SOF ¶ 8. The board also approved a performance based pay plan, allowing her to earn additional pay of up to 15% of her base salary. SOF ¶ 9.

When the addendum was approved in May 2014, the board consisted of Zamora, Alvarado, Elizabeth Sanchez ("Sanchez"), Billie Foltz ("Foltz"), and Adam Lopez Falk ("Falk"). SOF ¶ 6. In November 2014, two new board members, Martinez and Cathleen O'Neil Frantz ("Frantz"), were elected to replace Sanchez and Foltz. SOF ¶ 10. In December 2014, before the start of the new members' terms, the board met to discuss offering Plaintiff another contract when hers expired on June 30, 2015. ███

1   ███████████████████████████████████████  SOF ¶¶ 11-13. ████
2   ████████████████████████████████████████████████████████████
3   ████████████████████████████████████████████████████████████
4   ██████  SOF ¶¶ 11, 14.  ████████████████████████████████████
5   ████████████████████████████████████████████  SOF ¶¶ 12-14.
6   ████████████████████████████████████████████  SOF ¶¶ 11, 14.

In January 2015, Martinez and Frantz took office. SOF ¶ 10. The board met on January 22, 2015 to discuss Plaintiff's contract, and ████████████████████ ██████████████████████ SOF ¶¶ 15-17. After two executive sessions, the board reconvened in public and voted 5-0 that an additional one-year contract for Plaintiff "will be authorized" and would include a 5% increase to performance pay. SOF ¶ 18, Ex. 13. On January 23, the District's attorney emailed a proposed contract, performance pay plan, and resolution to Plaintiff's attorney. SOF ¶ 19. Plaintiff did not sign this proposed contract. Instead, she proposed that she retire as an Alhambra employee on June 30, 2015 and be employed by ESI, a third-party staffing company, instead of the District for the one-year term. SOF ¶ 20.

Neither Plaintiff nor the board had discussed ██████████████████ ████████████████████ in their December or January meetings. SOF ¶ 21. Board members viewed ESI as "double dipping" and "stealing" and noted ESI meant working for a "third party," not the District. SOF ¶¶ 22-24. The District did not accept Plaintiff's counteroffer, and on February 19, the board chose not to approve a one-year contract for Plaintiff with Alhambra directly or through ESI. SOF ¶ 25.

The board voted not to renew Plaintiff's contract on April 2, and entered into a search agreement with the Arizona School Boards Association ("ASBA") on April 22. SOF ¶¶ 26-27. ASBA published an invitation for applications, conducted a community

survey, and facilitated a selection input committee. SOF ¶ 27. Five finalists were selected; four of them chose to interview with the Board. SOF ¶ 28. The board approved second interviews for Michael Robert (African-American) and Mark Yslas (Hispanic) on May 14. SOF ¶¶ 29-30. Yslas stood out for his "ability to reach people" and his "charismatic [and] positive" demeanor, bringing "energy" and "new ideas" to the District. SOF ¶ 31.

On June 15, 2015, the board unanimously approved Yslas' written contract which he and the board signed. SOF ¶ 32. His base salary for the 2015-16 school year was $150,000. Benefits were also lower than Plaintiff's. The total value of his contract was approximately $75,000 less than the final year of Plaintiff's contract. SOF ¶ 33.

## II.     Legal Standard for Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510 (1986). Only facts "that might affect the outcome of the suit under the governing law" are material. *Id.*

Speculation and personal belief are not enough to create a genuine factual dispute. "To survive summary judgment, a plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

### III. Race and National Origin Discrimination

Plaintiff alleges in Count I (Title VII), Count II (Title VII), Count IV (§ 1983), and Count V (§ 1981) that she was discriminated against and her contract was not renewed due to her race and national origin, but no evidence supports her accusations. Typically, the *McDonnell Douglas* framework applies to these claims. *See Surrell v. California Water Serv. Co.*, 518 F.3d 1097, 1105 (9th Cir. 2008). First, to establish a prima facie case, "a plaintiff must offer proof: (1) that the plaintiff belongs to a class of persons protected by Title VII; (2) that the plaintiff performed his or her job satisfactorily; (3) that the plaintiff suffered an adverse employment action; and (4) that the plaintiff's employer treated the plaintiff differently than a similarly situated employee who does not belong to the same protected class as the plaintiff." *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006). For the fourth element, "the individuals seeking relief must demonstrate, at the least, that they are similarly situated to those employees in all material respects." *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006). This means individuals "have similar jobs and display similar conduct." *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003), *as amended* (Jan. 2, 2004). If a plaintiff meets this burden, the defendant has the burden "to articulate a legitimate, nondiscriminatory reason for the action. If the employer does so, the plaintiff must show that the articulated reason is pretextual." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 n.16 (9th Cir. 2004).

Plaintiff is African-American, and Defendants do not dispute for purposes of this motion that her non-renewal was an adverse employment action. But Plaintiff will not be able to establish a prima facie case because no similarly situated employees were treated differently than her. The board chose a Hispanic and an African-American as the two finalists for the superintendent position. The same board members who voted for her non-renewal had previously approved Plaintiff's hire, contract renewals and

1  offer of another contract, and they also selected Dr. Robert as a finalist in the
2  superintendent search.

3  Even if Plaintiff had established a prima facie case, Defendant had multiple
4  legitimate, nondiscriminatory reasons not to renew her contract.  Plaintiff's excessive
5  compensation was a major concern for the board members.  Plaintiff's compensation
6  was out of line with superintendents in other districts and saving money was a driving
7  factor in the Board's search.

8  Frantz testified that the board had ███████████████████████████████
9  █████████████████████████ SOF ¶ 34.  She said other board members
10 ██████████████████████████████████████████████████ SOF ¶ 35.
11 She recalled the discussion on February 19, 2015 included other members' ████
12 ████████████████████████████████████████████████████████████████
13 ██████████████████████████████████████ SOF ¶ 36.

14 Martinez testified that the board "saved the district a lot of money" when the
15 District hired Yslas "at a lower pay" than Plaintiff, and "that was the only way I would
16 have approved or voted or agreed to do this."  SOF ¶ 37.  He said board members ████
17 ████████████████████████████████████████████████████████████████
18 ███████████████████████████████ SOF ¶ 38.

19 Alvarado testified that the District was "not getting good value for what we were
20 compensating her for."   SOF  ¶  39.   She had inquired about the salaries of
21 superintendents in Cartwright Elementary School District ("ESD") and Glendale ESD,
22 districts "similar to Alhambra," in December 2014.  SOF ¶¶ 40-41.

23 Board members' concerns about compensation were well-justified.  Plaintiff
24 earned a base salary of $191,475 in 2013, putting her far above her peers.  SOF ¶¶ 5, 42.
25 In 2013, the mean salary for Arizona superintendents of elementary school districts was
26 $98,651.  SOF ¶ 42.  In 2014, Plaintiff had the highest reported base salary of all

elementary district superintendents in the state. SOF ¶ 43. When benefits were added, the gap between her and her peers widened, even though the District performed worse than its peers. *Id.*; Ex. 28. While Plaintiff was superintendent, the Arizona Department of Education ("ADE") annually reviewed school districts and individual schools and assigned them letter grades of A through F. The District received a B in 2011, Plaintiff's first year. The following three years, it received a C. SOF ¶ 44.

Superintendents in districts with comparable demographics made far less than Plaintiff, even when their student achievement far surpassed the District's. For example, Kyrene ESD received an A grade from ADE in 2012, 2013, and 2014, while its superintendent earned only $155,146.01 in base salary and $3,639.00 in performance pay for the 2014-15 school year. SOF ¶¶ 45-46. The same year, Cartwright ESD received a B grade from ADE, and its superintendent earned a base salary of $173,150, with a maximum of 2% of base salary as performance pay and no tax-deferred annuity. SOF ¶¶ 47-48; Ex. 26. Glendale ESD, a C district in 2014-15, paid its superintendent only $150,000 in base salary. SOF ¶¶ 49-50; Ex. 26.

Declining student achievement was another board concern during Plaintiff's tenure. Plaintiff admitted schools received a letter grade of D every year she was superintendent, and she was "deeply disappointed" with these grades. SOF ¶¶ 51-52. Alvarado testified that many of the schools fell from A to B and from B to C. SOF ¶ 53. Five schools had a D grade in 2014. SOF ¶ 52.

Sanchez testified that she "was very disappointed with the grades" and student achievement and these factors were "always a problem" since she joined the board in 2010. SOF ¶ 54. She stated that she and Zamora were "always questioning numbers, achievement, performance," and "we were all disappointed in student achievement." SOF ¶¶ 54-55. She further testified that the District's "failing schools" were "a negative reflection" on Plaintiff. SOF ¶ 55.

1       Declining enrollment was another legitimate concern of the board during
2 Plaintiff's tenure.  The District's charter school was forced to close in 2012 due to low
3 enrollment.  SOF ¶ 56.  Plaintiff acknowledged that student enrollment fell in the 2014-
4 15 school year, and that was a concern for her, the administrative team, and the
5 governing board.  SOF ¶ 57.  She also admitted that even as enrollment declined, out-of-
6 school suspensions had increased, and this metric was an important concern for her and
7 the board members and a number she wanted to reduce.  SOF ¶ 58.

8       High employee turnover and low morale were additional grounds for Plaintiff's
9 non-renewal.  Plaintiff was aware that the board had "concerns regarding the climate of
10 our work environment."  SOF ¶ 59; Ex. 34.  Zamora testified that "the morale of
11 teachers . . . would definitely affect the continuance of the superintendent" and he had
12 heard complaints about morale from staff.  SOF ¶ 60.  Frantz testified that board
13 members ████████████████████████████████████
14 SOF ¶ 35.  Board members' concerns were justified.  During Plaintiff's employment,
15 teacher turnover rose from 16.4% in 2010-11 to 22.9% in 2012-13 and remained above
16 16% during Plaintiff's entire employment as superintendent.  SOF ¶ 61.  Conversely,
17 teacher turnover fell to just 9.2% in Yslas' first year.  *Id.*

18       Plaintiff will be unable to show any of the board's reasons for not renewing her
19 contract were pretextual.  "To satisfy the unworthy of credence prong of the pretext
20 analysis, a plaintiff must identify specific inconsistencies, contradictions,
21 implausibilities, or weaknesses in the employer's explanation so that a reasonable
22 factfinder could infer that the employer did not act for the asserted reason."  *Hernandez*
23 *v. Arizona*, 702 F. Supp. 2d 1119, 1130 (D. Ariz. 2010).  "A plaintiff's belief that a
24 defendant acted from an unlawful motive, without evidence supporting that belief, is no
25 more than speculation or unfounded accusation about whether the defendant really did
26 act from an unlawful motive."  *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d

1026, 1028 (9th Cir. 2001). The allegations of discrimination in her complaint are unsupported or have been contradicted by the evidence; for example, Sanchez denied that Zamora made comments to her about Plaintiff's race or national origin, or wanting to end Plaintiff's career because she was not Latino. SOF ¶ 62; *cf.* doc. 16 ¶¶ 31, 42.

Plaintiff's claims of discrimination are further refuted by the same actor theory. "[W]hen the allegedly discriminatory actor is someone who has previously selected the plaintiff for favorable treatment, that is very strong evidence that the actor holds no discriminatory animus, and the plaintiff must present correspondingly stronger evidence of bias in order to prevail." *Coghlan v. Am. Seafoods Co. LLC.*, 413 F.3d 1090, 1100 n.10 (9th Cir. 2005). The board members who were willing to extend Plaintiff's employment in December 2014 and in January 2015 are the same members who were unwilling to accept her counteroffer in April 2015 to change the most fundamental and material term of the Board's offer – who would employ her. Plaintiff has not presented evidence of bias sufficient to overcome the undisputed evidence of favorable treatment.

**IV.   Retaliation**

"A plaintiff may meet his burden of proof for a claim of retaliation under Title VII by showing, by a preponderance of the evidence, (1) involvement in protected activity opposing an unlawful employment practice, (2) an adverse employment action, and (3) a causal link between the protected activity and the adverse action." *Freitag v. Ayers*, 468 F.3d 528, 541 (9th Cir. 2006). To show causation, Plaintiff must establish that "but for such activity," no adverse action would have occurred. *Kauffman v. Sidereal Corp.*, 695 F.2d 343, 345 (9th Cir. 1982).

Plaintiff's claim of protected activity is based on a letter she sent to the board in December 2013, in which she outlined the non-discrimination laws and policies followed by the District. SOF ¶ 59; Ex. 34. This letter does not make complaints about board members, assert that she or other employees have been subject to discrimination,

or otherwise complain that the District has violated Title VII. It simply states that the District does not discriminate. It does not establish the first element of her claim.

Plaintiff testified she was retaliated against when she was placed on non-disciplinary paid leave in March 2015. SOF ¶ 63. But this was not an adverse action. In *Dahlia*, the court determined that being placed on leave could potentially be an adverse action; the court also noted, however, that the employee in that case alleged that being on leave prevented him from taking a promotional exam and resulted in a loss of pay. *Dahlia v. Rodriguez*, 735 F.3d 1060, 1079 (9th Cir. 2013). Plaintiff has not alleged any such negative effects here. Even if her 2013 letter were a protected activity, causation cannot be inferred where the board did not place her on leave until 15 months later. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002). Her claims of retaliation in Count III (Title VII) and Count IV (§ 1983) cannot move beyond the summary judgment stage.

**V.    Breach of Contract and Implied Covenant of Good Faith and Fair Dealing**

Plaintiff alleged that Alhambra provided her "with a written contract with a fixed term of employment" of "one year" and she was "discharged from employment . . . contrary to the terms of the contract." (Doc. 16 ¶¶ 164, 167-68.) Plaintiff also alleges she was terminated despite the existence of a contract in violation of 42 U.S.C. § 1983. *Id.* ¶ 150. Summary judgment must be granted in favor of the District on Counts IV, VI, and VIII since no contract existed or could have existed under the undisputed facts.

*a. The District is subject to the open meeting law and therefore can only take legal action at a public meeting.*

Arizona school districts are political subdivisions. *See* A.R.S. § 38-431(5). As such, they are subject to the state's open meeting law, which demands that "[a]ll meetings of any public body shall be public meetings . . . ." A.R.S. § 38-431.01(A).

Public bodies may meet in private (known as executive session) only for specific, statutorily authorized purposes, such as "consideration of employment" or "legal advice." A.R.S. § 38-431.03(A). They are expressly prohibited, however, from taking "[l]egal action involving a final vote or decision" in executive session. A.R.S. § 38-431.03(D). Instead, a "public vote shall be taken before any legal action binds the public body." *Id.*; *see also* A.R.S. § 38-431.01(A) ("All legal action of public bodies shall occur during a public meeting."). As a result, public bodies may "hold executive sessions only for discussion or consideration of the purposes enumerated, but they may not take final legal action . . . in executive session." *Cooper v. Arizona W. Coll. Dist. Governing Bd.*, 125 Ariz. 463, 466, 610 P.2d 465, 468 (App. 1980).

"'Legal action' means a collective decision, commitment or promise made by a public body pursuant to the constitution, the public body's charter, bylaws or specified scope of appointment and the laws of this state." A.R.S. § 38-431(3). Entering into a contract is a legal action and cannot, as a matter of law, occur in an executive session.

### *b. A school district superintendent's employment contract must be written.*

A school district's governing board has the authority and the duty to "employ and fix the salaries and benefits of employees" of the district and is specifically permitted to employ a superintendent for "any period not exceeding three years." A.R.S. §§ 15-502(A), 15-503(A)(1).

In addition to limiting the term of a superintendent's contract, Arizona law requires that the contract be written. Superintendents of Arizona school districts must be certified by ADE. *See* Ariz. Admin. Code R7-2-616 (supervisor or superintendent certificate is required for all personnel primarily responsible for administrative duties). Administrators and teachers who hold certificates issued by ADE are referred to as "certificated" employees. Ariz. Admin. Code R7-2-1301(4) ("certificated individual" is

1  one "who holds an Arizona certificate issued pursuant to R7-2-601 et seq."). Arizona
2  law is crystal clear that "the contracts of all certificated employees **shall be in**
3  **writing**[.]" A.R.S. § 15-502(A) (emphasis added).

         *c. The District's board did not take legal action to hire Plaintiff.*

5      In combination, the open meeting law and § 15-502 provide that a
6  superintendent's contract must be in writing, signed and approved at a public meeting.
7  The undisputed facts show that no written contract was agreed upon and the District's
8  governing board did not approve any contract for Plaintiff's employment past June 30,
9  2015. Rather, her previous contract expired and no new contract was approved.

10     The board minutes from January 22, 2015 reflect that the board voted that it
11 would authorize a one-year contract for Plaintiff with a 5% increase to performance pay.
12 SOF ¶ 18. The board members did not sign a contract at this meeting or approve a
13 contract signed by Plaintiff. Indeed, Plaintiff never signed a contract other than the one
14 that expired on June 30, 2015. SOF ¶ 64. The Board approved an offer of a one-year
15 contract with the same terms as the 2012-2015 contract, and a change in the percentage
16 of performance pay. SOF ¶ 18. At the meeting on February 19, 2015, following
17 Plaintiff's counteroffer to retire from Alhambra and work for ESI, a motion to approve a
18 contract for Plaintiff failed for lack of a second. SOF ¶ 25. The board did not vote to
19 approve a written contract beyond June 30, 2015 that night or thereafter. SOF ¶ 64.

20     "If a school board is to take legal action by making a collective decision,
21 commitment or promise, it must do so at an open public meeting or the action is void."
22 *Ahnert v. Sunnyside Unified Sch. Dist. No. 12*, 126 Ariz. 473, 474, 616 P.2d 933, 934
23 (App. 1980). Plaintiff pled that the District's board somehow took legal action in
24 executive session to enter into a verbal contract with her. (Doc. 16 ¶¶ 71-72.) Not only
25 is she incorrect factually and legally (verbal employment contracts are prohibited), but
26 any such action would have violated the open meeting law and therefore have been

"null and void." A.R.S. § 38-431.05(A). "Actions taken in violation of the open meeting law 'cease to exist or have any effect.'" *Johnson v. Tempe Elem. Sch. Dist. No. 3 Governing Bd.*, 199 Ariz. 567, 570, 20 P.3d 1148, 1151 (App. 2000), *as amended* (Mar. 22, 2001) (quotation omitted). As a result, not only did the board not enter into a contract with her in a public meeting, it did not and could not have entered into a contract with her in executive session, and any purported contract made in executive session would have been null and void. *Id.*

    *d. No written contract exists because Plaintiff and the District did not reach an agreement.*

  Even if there were no statutory prohibitions against oral contracts for superintendents or against public entities forming contracts in executive session, Plaintiff could not show that she had a contract with the District. Her breach of contract claim is covered by the Employment Protection Act ("EPA"). A.R.S. § 23-1501 *et seq.* The EPA "changes our inquiry from whether the employment agreement is enforceable at common law to whether the employment agreement satisfies the statutory requirements." *Johnson v. Hispanic Broads. of Tucson, Inc.*, 196 Ariz. 597, 599, 2 P.3d 687, 689 (App. 2000). Accordingly, the EPA "governs all aspects" of Plaintiff's breach of contract claim. *White v. AKDHC, LLC*, 664 F. Supp. 2d 1054, 1062 (D. Ariz. 2009).

  To be enforceable under the EPA, a written contract must set forth "that the employment relationship shall remain in effect for a specified duration of time or otherwise expressly restrict[] the right of either party to terminate the employment relationship." A.R.S. § 23-1501(A)(2). It must also "(1) be signed by both parties, or (2) be signed by the party to be charged, or (3) be included in an employment handbook, manual, or similar document that expresses an intent for it to be an employment contract." *White*, 664 F. Supp. 2d at 1062. "Therefore, to prevail on [her] breach of contract claim, [Plaintiff] bears the burden of showing that there is a written contract

1  that meets one of the two substantive requirements and one of the three formalities
2  outlined in A.R.S. § 23-1501[A](2)." *Id.* at 1063. She has failed to meet her burden.
3        Under the EPA, no contract could have been formed without all parties agreeing
4  to the same terms and signing a written document, or at the very least, the District
5  signing the document. It is undisputed that no contract was signed for a term past June
6  30, 2015. SOF ¶ 64. When the District's attorney emailed Plaintiff's attorney a
7  proposed contract with the terms discussed at the January 22, 2015 board meeting,
8  Plaintiff did not sign it, rejected the offer and proposed a counteroffer, which the
9  District did not accept. SOF ¶¶ 19-20. Since the parties failed to reach an agreement,
10 neither Plaintiff nor the board members ever signed a contract, as she has admitted. She
11 cannot show the requirements of § 23-1501 were met.

12         *e. The statute of frauds bars Plaintiff's claim for breach of contract.*

13       Under Arizona's statute of frauds, no action may be brought on "an agreement
14 which is not to be performed within one year from the making thereof" unless it is "in
15 writing and signed by the party to be charged." A.R.S. § 44-101(5). There was no
16 possibility that the contract Plaintiff claims was made could have been performed within
17 one year. Plaintiff alleges a contract was entered into "through her counsel." (Doc. 16
18 ¶¶ 76, 81, 166). Even if that were possible, the contract would have required her to
19 work for the District "until June 30, 2016" – more than one year and five months after
20 allegedly being made. SOF ¶ 19; Ex. 14 at AESD4172. Generally, "a contract of
21 employment to start in the future, and to continue for one year, is within the Statute of
22 Frauds." *Co-Op Dairy, Inc. v. Dean*, 102 Ariz. 573, 574, 435 P.2d 470, 471 (1967).
23 Under the facts here, where there was no way in which Plaintiff could have fulfilled the
24 proposed contract within one year, she is barred by the statute of frauds.

25         *f. Without a contract, Plaintiff has no claim for breach of the implied*
26           *covenant of good faith and fair dealing.*

Plaintiff alleges the District breached its duty of good faith and fair dealing "by breaching Plaintiff's valid employment contract by discriminating, retaliating, and ultimately terminating Plaintiff's employment." (Doc. 16 ¶ 184.)

"Arizona law implies a covenant of good faith and fair dealing in every contract." *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Tr. Fund*, 201 Ariz. 474, 490, 38 P.3d 12, 28 (2002). "The duty arises by operation of law but exists by virtue of a contractual relationship." *Id.* An "underlying contract provides the basis for a bad faith action." *Taylor v. State Farm Mut. Auto. Ins. Co.*, 185 Ariz. 174, 176, 913 P.2d 1092, 1094 (1996). "For example, the covenant protects an employee from discharge because his employer wishes to avoid the payment of benefits the employee has already earned, such as sales commissions." *Woerth v. City of Flagstaff*, 167 Ariz. 412, 418 n.8, 808 P.2d 297, 303 n.8 (App. 1990). As a result, "the relevant inquiry always will focus on the contract itself, to determine what the parties did agree to." *Wagenseller v. Scottsdale Mem'l Hosp.*, 147 Ariz. 370, 385, 710 P.2d 1025, 1040 (1985) (superseded by statute on other grounds).

As outlined above, Plaintiff had a contract of employment with the District only through June 30, 2015. She has not alleged that her 2012-2015 contract was breached, and she admits that she received all salary and benefits promised to her in that contract. SOF ¶ 65. The covenant of good faith and fair dealing "protects an employee only to the extent that the employer denied the terminated employee benefits agreed to in the employment contract." *White*, 664 F. Supp. 2d at 1065. There were no benefits promised in the 2012-2015 contract which Plaintiff did not receive, and thus she has no claim for breach of the covenant of good faith and fair dealing based on this contract.

After the 2012-2015 contract ended, Plaintiff and the District did not enter into a further contract. The covenant of good faith "does not extend to negotiations," and therefore no implied duty could arise by virtue of the parties' unsuccessful negotiations

for a contract past June 30, 2015.  *Silving v. Wells Fargo Bank, NA*, 800 F. Supp. 2d 1055, 1071 (D. Ariz. 2011) (citing Restatement (Second) of Contracts § 205 cmt. c).

Additionally, Plaintiff cannot succeed on this claim since she has no damages. "Damages are an essential element of a claim for breach of the implied covenant of good faith and fair dealing. . . . [and] are usually limited to ordinary contract damages." *White*, 664 F. Supp. 2d at 1066 (internal citations omitted).  Plaintiff was fully paid all salary and benefits owed under her 2012-2015 contract.  She was not entitled to a contract past 2015, and she has no contract damages from that date through the present.

A similar situation arose in *Picht v. Peoria Unified School District*, where an administrator asserted that a school district breached the implied duty of good faith and fair dealing when it notified him that it would not renew his contract and retaliated against him.  641 F. Supp. 2d 888 (D. Ariz. 2009).  Like Plaintiff, Picht admitted he received all benefits to which he was entitled under the last contract before non-renewal.

> Also, Plaintiff neither alleges that Peoria Unified has superior bargaining power and has abused it, nor alleges facts from which that could be inferred. Therefore, Plaintiff can recover for breach of the implied covenant only if the express terms of the contract have been breached.  The uncontested facts establish that Plaintiff has received all the expressed benefits of the 2006 employment contract; the procedures by which the decision to renew the contract were to be made are not express terms of the contract.

*Id.* at 897.  This Court held that Picht "cannot support an action in tort or in contract for breach of the employment contract's implied covenant," and granted summary judgment to the school district.  *Id.*  Summary judgment is similarly appropriate here, where Plaintiff received all benefits of her 2012-2015 contract, no duty can be implied past June 30, 2015 when she had no further contract, and no damages exist.

**VI.   Wrongful Termination Under the EPA**

In Count VII, Plaintiff alleges that she was terminated in violation of the EPA for reporting violations of state law to the board.  (Doc. 16 ¶¶ 175-79.)  The EPA provides a

cause of action for an employee terminated in retaliation for the disclosure of "information or a reasonable belief that the employer, or an employee of the employer, has violated, is violating or will violate the Constitution of Arizona or the statutes of this state." A.R.S. § 23-1501(A)(3)(c)(ii). The express language of the statute is unequivocal and requires the actual disclosure of a transgression of Arizona law in order to constitute protected activity. *See Galati v. America West Airlines, Inc.*, 205 Ariz. 290, 293, ¶ 10, 69 P.3d 1011, 1014 (App. 2003).

Her allegation that she was retaliated against for reporting violations of the open meeting law and conflicts of interest has no factual support. (Doc. 16 ¶ 175.) Her assertion that she was retaliated against for refusing to recognize ADEA as the District union fails to allege any disclosure of a violation of state law. *Id.* Her allegations that she was retaliated against for reporting a hostile work environment and discriminatory hiring practices fail for the same lack of factual support as her claim of retaliation under Title VII. Moreover, while she alleges she complained about "discriminatory hiring practices," she testified that the board had approved every hiring decision she ever recommended, including non-renewing teachers and hiring administrators and teachers. SOF ¶ 66. Board approval of hires she recommended cannot support this claim.

**VII. Conclusion**

The District's declining student achievement, declining enrollment, increasing disciplinary problems, increasing staff turnover, low employee morale, and Plaintiff's exorbitant compensation were all nondiscriminatory factors weighed by the District's board in its decision to offer Plaintiff a one-year contract instead of Plaintiff's desired three-year contract and to reject her eventual counteroffer to work for ESI instead of the District. Plaintiff will be unable to show that these factors were pretextual. She will similarly be unable to show that she had, or could have had, any contract with the District that was breached. Summary judgment should be granted in Defendants' favor.

RESPECTFULLY SUBMITTED this 15th day of September, 2017.

                GUST ROSENFELD P.L.C.

                By */s/ Robert D. Haws – 012743*
                    Robert D. Haws
                    Shelby M. Exposito
                    Attorneys for Defendants

**CERTIFICATE OF SERVICE**

I hereby certify that on September 15, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing. Copy mailed to the following:

| | |
|---|---|
| Michael Zoldan<br>Jessica Miller<br>**ZOLDAN LAW GROUP, PLLC**<br>14500 N. Northsight Blvd., Suite 213<br>Scottsdale, AZ  85260 | Zachary Price<br>**COOK & PRICE, PLC**<br>60 E. Rio Salado Road, Suite 900<br>Tempe, AZ 85281 |

Attorneys for Plaintiff

                */s/ Pauletta J. Seitz*